**McLOUTH STEEL PRODUCTS CORPORATION, Petitioner,**

v.

**Lee M. THOMAS, Administrator, and U.S. Environmental Protection Agency, Respondents.**

**No. 87–1049.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1987.

Decided Feb. 5, 1988.

As Amended Feb. 10, 1988.

Jay E. Brant, with whom William A. Wichers II, Detroit, Mich., and Peter D. Holmes, Lansing, Mich., were on the brief, for petitioner.

J. Carol Williams, Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen. and Robert L. Klarquist, Dept. of Justice, Washington, D.C., were on the brief for respondents. Lisa F. Ryan, Dept. of Justice, Washington, D.C., and Joshua Sarnoff, Counsel, U.S. E.P.A. also entered appearances for respondents.

David R. Case, Washington, D.C., was on the brief for amicus curiae, Hazardous Waste Treatment Council, urging affirmance.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and HOGAN,* District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

This case presents a challenge by McLouth Steel Products Corporation to the Environmental Protection Agency's denial of its petition to exclude waste generated at its steel-making facility from EPA's list

* Of the United States District Court for the District of Columbia, sitting by designation pursu-ant to 28 U.S.C. § 292(a).

of hazardous waste subject to regulation under the Resource Conservation and Recovery Act of 1976 ("RCRA"). 42 U.S.C. § 6901 *et seq.* (1982). We believe that in so doing it gave the effect of a rule to its "VHS model"—a systematic approach to computing probable contamination levels—without having exposed the model to the comment opportunities required for rules by the Administrative Procedure Act, 5 U.S.C. § 553 (1982). Accordingly, we remand the case to the EPA.

Subtitle C of RCRA requires EPA to promulgate regulations establishing a comprehensive federal management system to protect human health and the environment from hazardous wastes. 42 U.S.C. §§ 6921-34. Section 3001 of RCRA, 42 U.S.C. § 6921, directs EPA to identify those wastes that are hazardous and thus subject to regulation under Subtitle C. The air-pollution devices of McLouth's furnaces generate a type of sludge and dust (here referred to simply as sludge) that EPA included in its list of hazardous wastes. *See* 40 C.F.R. § 261.32 (1985).

Once EPA lists a waste as hazardous, a party may petition EPA for delisting—exclusion of its specific waste from the generic listing. 42 U.S.C. § 6921(f); 40 C.F.R. § 260.22. EPA's regulations specify a two-pronged test for granting delisting. First, the petition must demonstrate that the particular facility's waste "does not meet *any* of the criteria under which the waste was listed as a hazardous waste." 40 C.F.R. § 260.22(a)(1) (emphasis added). Second, if the Administrator "has a reasonable basis to believe that factors (including additional constituents) other than those for which the waste was listed could cause the waste to be a hazardous waste," then the Administrator must determine "that such factors do not warrant retaining the waste as a hazardous waste." *Id.* § 260.22(a)(2). *See also id.* § 260.22(d)(2). Unless such an exclusion is granted, any company that generates a listed waste must manage it in accor-

dance with the system set forth in RCRA's Subtitle C.

On September 25, 1981, McLouth filed a petition requesting delisting for the sludge from its Trenton, Michigan plant. Joint Appendix at 57. On November 18, 1986, EPA denied the petition on the ground that McLouth had not substantiated its claim that the waste was non-hazardous. 51 Fed. Reg. 41,624 (Nov. 18, 1986).

In arriving at that conclusion, EPA used its VHS model (referring to "vertical and horizontal spread") to predict the "leachate" levels of the hazardous components of McLouth's waste.[1] The model "estimates the ability of an aquifer to dilute the toxicants from a specific volume of waste, and predicts toxicant levels at a receptor well." 50 Fed.Reg. 48,886/3 (Nov. 27, 1985). It is not intended to predict contamination based on conditions at the specific site of disposal. Rather, it is based on certain "reasonable worst case assumptions," 50 Fed.Reg. 7,882, 7,883/2 (Feb. 26, 1985), because, EPA reasons, "it cannot be guaranteed that the site-specific circumstances will not change." 50 Fed.Reg. at 48,907/3. A user of the model feeds into it data as to the actual leachate concentrations of the constituents of a specific waste, and the amount of waste generated at the site, and the model predicts contamination levels. EPA then compares these predictions with health-based standards for each constituent to determine whether a waste should be delisted.

The VHS model predicted that significant levels of two hazardous constituents, lead and cadium, would leach from McLouth's waste and contaminate the groundwater. 51 Fed.Reg. 41,624-625 (Nov. 18, 1986). McLouth filed suit in this court under 42 U.S.C. § 6976(a)(1) (1982), arguing that the model was in fact a legislative rule promulgated without adherence to § 553's notice-and-comment requirements. EPA argues that the model is just a policy, not a rule, and that if a rule its adoption was in compliance with § 553. We find that petitioner has the better of the argument.[2]

1. EPA has defined "leachate" as "any liquid, including any suspended components in the liq-

uid, that has percolated through or drained from hazardous waste." 40 C.F.R. § 260.10.

2. The EPA disposes of a delisting petition by

## I. The VHS Model: a Rule or a Policy?

EPA argues that the VHS model is not subject to § 553 because it falls under § 553(b)(3)(A)'s exception for "general statements of policy." According to the EPA, the VHS model is merely a "non-binding statement of agency policy" that is "not solely determinative of EPA's action on a delisting petition," but rather is just "one of many tools" it uses in evaluating delisting petitions. Brief for Respondent at 20–22. McLouth disputes this characterization, arguing that EPA applies the model with the inflexibility of a rule.

This court recently confronted the rule/policy distinction in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C.Cir.1987). In attempting to flesh out the "tenuous," "blurred," and "fuzzy" distinction between legislative rules and policy statements, *id.* at 946, we identified two criteria. A policy statement is one that first, does not have "a present-day binding effect," that is, it does not "impose any rights and obligations," and second, "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Id.* at 946 & n. 4 (quoting *American Bus Ass'n v. United States*, 627 F.2d 525, 529 (D.C.Cir.1980)). *See also Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112–13 (D.C.Cir.1974) (legislative rules "narrow [the decisionmaker's] field of vision" and are "of a kind calculated to have a substantial effect on ultimate [agency] decisions."); *Guardian Federal Savings & Loan Ass'n v. FSLIC*, 589 F.2d 658, 666–67 (D.C.Cir.1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that *narrowly limits administrative discretion*, it will be taken for what it is—a binding rule of substantive law.") (quoted in *Community Nutrition*, 818 F.2d at 948 (emphasis in original)).

In practice, there appears some overlap in the *Community Nutrition* criteria; the second criterion may well swallow the first. If a statement denies the decisionmaker discretion in the area of its coverage, so that he, she or they will automatically decline to entertain challenges to the statement's position, then the statement is binding, and creates rights or obligations, in the sense those terms are used in *Community Nutrition*. The question for purposes of § 553 is whether a statement is a rule of present binding effect; the answer depends on whether the statement constrains the agency's discretion.

We find that the VHS model meets the definition of a legislative rule under the *Community Nutrition* criteria. For openers, EPA's current claim that "it does not consider itself ... bound by [the VHS] model" (Br. at 20) is obviously of little weight. The agency's past characterizations, and more important, the nature of its past applications of the model, are what count. *See Community Nutrition*, 818 F.2d at 946 (noting that "courts are to give far greater weight to the language actually used by the agency" in the past than to its present characterization of the rule).

It is true that in the Federal Register notices announcing EPA's intent to employ the VHS model, EPA indicated that it retained discretion to deviate from its use. *See, e.g.*, 50 Fed.Reg. at 7,883 (VHS model is "one factor to determine the potential impact of unregulated disposal of petitioned waste on human health and the environment"); *id.* at 7,886 (if waste fails VHS model "the waste could be considered non-hazardous"); *id.* at 48,910 ("the VHS model results, while providing important input to a delisting decision, are not necessarily the sole basis for such a decision"). Yet other language in that notice strongly suggests that EPA will treat the model as a binding norm. For example, in its first reference to the VHS model, EPA referred to it as "the quantitative approach" that "*will* be used to predict the level of the various toxicants which could migrate to environmental receptors." *Id.* at 7,882, 7,896 (emphasis added). The use of the word "will" suggests the rigor of a rule, not

means of a rulemaking under 5 U.S.C. § 553 (1982), and McLouth also argues that EPA provided it so little time in that rulemaking as to violate § 553's requirement of an adequate "opportunity" to comment. In light of our disposition of McLouth's first claim, it is unnecessary for us to reach this issue.

the pliancy of a policy. *See Community Nutrition,* 818 F.2d at 947; *American Bus Ass'n,* 627 F.2d at 532.

EPA has stated that factors not included in the model "may be considered in the delisting decision where the petitioner can make a *compelling* case that they are germane to a particular petition." 50 Fed. Reg. at 48,910/2. Though such a provision for exceptions obviously qualifies a rule— it's not "ironclad"—, it does not push it much in the direction of a policy statement.

More critically than EPA's language adopting the model, its later conduct applying it confirms its binding character. In its final decision on McLouth's delisting petition, it stated that "even if the listed wastes do not exhibit the characteristics of hazardous waste, the wastes *must also pass* the VHS model evaluation ... in order to be delisted." 51 Fed.Reg. 41,624/3 (Nov. 18, 1985) (emphasis added). Further, it said that "the VHS model was made final on November 27, 1986 ... and all comments received on the proposal for the model were incorporated. Generally these comments are no longer entertained by the agency." *Id.* at 41,626.

EPA was even more close-minded and dismissive in its denial of a delisting petition by LTV Steel Company:

> LTV had several criticisms of individual parameters used in the VHS model itself (e.g., the dilution predicted by the model for large volume wastes and the lack of attenuation for metal species). Since the VHS landfill model *was made final* on November 27, 1985 (see 50 FR 48886, Appendix), and all comments received in the proposal for the model were incorporated, *these comments will not be entertained.*

51 Fed.Reg. 41,317–18 (Nov. 14, 1986) (emphasis added).

The language quoted above is similar to the "type of mandatory, definitive language" that was "a powerful, even potentially dispositive, factor" in this court's determination that the FDA action levels in *Community Nutrition* were legislative rules. 818 F.2d at 947. Like the rules at issue in *Community Nutrition,* "[t]he agency's own words strongly suggest" that the model is not just a "musing[ ] about what the [agency] might do in the future." *Id.* at 948. The agency treated the model as conclusively disposing of certain issues—the relationship between its input (leachate concentrations and amounts of waste) and its output (predicted contamination levels). On those issues, EPA was simply unready to hear new argument. The model thus created a norm with "present-day binding effect" on the rights of delisting petitioners.

As evidence of its flexible use of the VHS model, EPA calls our attention to *four* instances in which it rejected the model's predictions. These four come out of approximately 100 final delisting decisions since its appearance (see Exhibit J). (EPA evidently ran the model in *all* delisting applications filed after its adoption and which were not rejected as incomplete. *See* Reply Brief at 4 n. 4.) But these four rejections in no way reflect any EPA willingness to question the model itself. In three EPA made adjustments simply because the model had been fed faulty data, *see* 51 Fed.Reg. 16,865–66 (May 7, 1986); *id.* at 16,068–70 (April 30, 1986); *id.* at 36,247–49 (Oct. 9, 1986). In the fourth, the variability of a waste treatment facility's raw material led EPA to grant a delisting that was in fact based on the VHS model, as it was conditioned on the applicant's testing each batch of waste under the model, and, as to any batch that failed the model, providing new treatment or disposition under RCRA's management system, *see id.* at 36,976–79 (Oct. 16, 1986). If a rule says, "If A, then B," an agency does not show its open-mindedness when it refuses to find B after being persuaded that A is not the case.

Thus despite its claim that it is open to "new approaches" to delisting decisions, *see* Brief for Respondent at 24, EPA has evidenced almost no readiness to reexamine the basic propositions that make up the VHS model, *i.e.,* propositions about the numerical relationship between leachate concentrations and waste quantities on one

hand and groundwater contamination on the other. It treated those issues as resolved. *See Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C.Cir. 1987) (statement would be classified as rule if agency treated its positions as no longer open to discussion)..

EPA's claim to have been open to consideration of other factors does not make the VHS model any less of a rule. *See* 50 Fed.Reg. 7,896 (stating VHS model is a quantitative tool for assessing 6 of the 11 factors that must be considered under the delisting regulations). If a disposition turns on affirmative answers to two questions, and an agency adopts a rule giving conclusive answers to the first question once certain data are supplied, the rule is a rule even though it does not purport to answer the second question. *Cf. Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112–13 (D.C.Cir.1974) (parole guidelines held legislative rules because they focus attention on specific factors to the implicit exclusion of others, thereby "defin[ing] a fairly tight framework to circumscribe the [agency's] statutorily broad power").

The EPA has rested on the policy statement exception to § 553's requirements, which we find inapplicable. Though not invoking the exception for interpretive rules, it does couch one point in terms reminiscent of some characterizations of such rules. It says that the model "merely implements the standards imposed by EPA's delisting regulations [40 C.F.R. § 260.11(a)(3) ]." Brief for Respondent at 24. It points out that "[t]he VHS model has not changed these standards; rather it

provides a quantitative framework for assessing these factors." *Id.*

While the exact definition of an interpretive rule is unclear,[3] it is clear that we don't have one here. The VHS model meets *Community Nutrition*'s affirmative definition of a legislative rule: it substantially curtails EPA's discretion in delisting decisions and accordingly has present binding effect. While not all rules of thumb are legislative rules, they are when they have these characteristics.

## II. FAILURE TO PROVIDE ADEQUATE NOTICE AND OPPORTUNITY TO COMMENT

■ Perhaps paradoxically, EPA argues that while "at no time did it claim to be proposing the model as a rule," Brief for Respondent at 21–22, the model should, if found a rule, be upheld because its promulgation satisfied the requirements of 5 U.S. C. § 553. According to EPA, it provided notice in its introduction of the model in a 1985 Federal Register notice of six proposed delistings. The notice called for comment on the model. QED.[4]

The story, however, is not so simple. Although the notice's heading spoke of a "Proposed rule and request for comment," a reader going on to the "Summary" would find no reference to the VHS model, only to EPA's proposed treatment of the six specific delisting petitions (which EPA addresses in the format of a notice-and-comment rulemaking, *see* 40 C.F.R. § 220.20). It is true that EPA described the VHS model generally in an early section of the notice headed "Supplementary Information" (saving the details for an appendix), and even invited comments on the subject. 50 Fed.Reg. at

---

**3.** *Community Nutrition* appears to treat interpretive rules as synonymous with policy statements. The dividing lines drawn by other decisions are far from self-applying. *See, e.g., United Technologies Corp. v. EPA*, 821 F.2d 714, 719–20 (D.C.Cir.1987) ("If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one."); *Thomas v. New York*, 802 F.2d 1443, 1447

(D.C.Cir.1986) (interpretive rule is a "statement interpreting an existing statute or rule") (citations omitted), *cert. denied*, — U.S. —, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987).

**4.** EPA makes no claim that the model can be sustained as the product of an adjudication. *Cf. NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 763, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969) (Fortas, J., for plurality); *id.* at 770, 89 S.Ct. at 1432 (Black, J., concurring in result); *id.* at 775–77, 89 S.Ct. at 1434–36 (Douglas, J., dissenting); *id.* at 780, 89 S.Ct. at 1437 (Harlan, J., dissenting).

7,882–83. But this appeared under a sub-heading "Approach Used to Evaluate De-listing Petitions." We think the term "Approach" suggests more malleability and vagueness than actually characterized the VHS model, and thus, in view of the complete omission of the model from the Summary, would not have alerted a reader to the stakes.

An agency may not introduce a proposed rule in this crabwise fashion. No earlier cases finding inadequacy of notice are exactly parallel, but they suggest the courts' concern that notice be clear and to the point. *See AFL–CIO v. Donovan,* 757 F.2d 330, 339 (D.C.Cir.1985) ("no notice, much less adequate notice" where agency reprinted entire set of regulation in 40 pages of the Federal Register, including the proposed change but not identifying it in the preamble, which highlighted other proposed changes); *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 899 (D.C.Cir.1978) (notice inadequate since it indicated that agency intended to suggest congressional amendments of its enabling act rather than new administrative rules); *American Iron & Steel Inst. v. EPA,* 568 F.2d 284, 291 (3d Cir.1977) (notice did not state manufacturing processes to be covered by the proposed regulations); *Wagner Electric Corp. v. Volpe,* 466 F.2d 1013, 1019–20 (3d Cir.1972) (notice inadequate where only "some knowledgeable" manufacturers would grasp link between subject notice identified and broader subject of final rule). Because the notice was inadequate, EPA's consideration of the comments received in response thereto, *see* 50 Fed.Reg. at 48,896–910 (in an Appendix to its disposition of the six specific delisting applications), no matter how careful, cannot cure the defect. *See AFL–CIO v. Donovan,* 757 F.2d 330, 339–40 (D.C.Cir.1985) (actual notice cannot be attributed to parties on assumption that they monitor others' comments); *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 549–50 (D.C.Cir.1983) (same—notice requirement not "an elaborate treasure hunt"). *But see Common Carrier Confer-*ence v. United States,* 534 F.2d 981, 982–83 (D.C.Cir.), *cert. denied,* 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976) (finding that "industry was generally on notice").

 Nor was the defect cured by McLouth's actual notice of the VHS model and its chance to comment on it in its own delisting case (which took the form, as noted above, of a "rulemaking"). Of course it is true that defects in an original notice may be cured by an adequate later notice, *Forester v. Consumer Products Safety Commission,* 559 F.2d 774, 788 (D.C.Cir. 1977), but that curative effect depends on the agency's mind remaining open enough at the later stage. *Id.* at 788 n. 19; *National Ass'n of Farmworkers Organizations v. Marshall,* 628 F.2d 604, 621–22 (D.C.Cir. 1980); *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 901–02 (D.C. Cir.1978). Here, although EPA responded to most of McLouth's comments on the model, its refusal to respond in other cases (such as that of LTV), as well as its language on the subject in the McLouth case itself, suggest too closed a mind. Consideration of comments as a matter of grace is not enough.

### III. REMEDY

 EPA argues that despite the procedural irregularities, McLouth cannot secure reversal of the adverse decision unless it demonstrates that the irregularities caused "specific prejudice," citing *In re Surface Mining Regulation Litig.,* 627 F.2d 1346, 1354 n. 9 (D.C.Cir.1980); *Air Transport Ass'n of America v. CAB,* 732 F.2d 219, 224 n. 11 (D.C.Cir.1984) ("Petitioner also does not explain what it would have said had it been given earlier access to the staff studies. Under such circumstances, any error generally would be found harmless."); and *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 540–41 (D.C.Cir.1983) ("It is also incumbent upon a petitioner objecting to the agency's late submission of documents to indicate with 'reasonable specificity' what portions

of the documents it objects to and how it might have responded if given the opportunity."). But these decisions put that burden on the challenger where the agency merely failed to provide proper access to some *supplemental* study or studies that partially undergirded its rule. Without deprecating the importance of such studies (or of such disclosure failures), we think imposition of such a burden on the challenger is normally inappropriate where the agency has completely failed to comply with § 553. Even if the challenger presents no bases for invalidating the rule on substantive grounds, we cannot say with certainty whether petitioner's comments would have had some effect if they had been considered when the issue was open. Unwillingness to place this risk on the challenger presumably lies behind the one case we found addressing the issue of prejudice in the context of outright failure to comply with § 553, *United States Steel Corp. v. EPA,* 595 F.2d 207, 215 (5th Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980), and holding that its absence must "be clear" for harmless error to be applicable.

While we are unwilling to endorse the Fifth Circuit's blanket rule,[5] we see no factors here militating against remand except for the universally available one that it will consume agency time. McLouth's temporary exclusion from managing its waste in accordance with the RCRA scheme expired as a matter of law on November 8, 1986, *see* 42 U.S.C. § 6921(f)(2)(B), so resumption of the process will not jeopardize the environmental values that RCRA seeks to protect. Nor will remand impinge on any other relevant value, except, as noted, the problem of agency resources. Remand will of course give petitioner one more procedural bite at the apple, but it is the first bite of the

quality to which it was entitled from the start.

In holding that EPA violated § 553's notice and comment procedures we do not mean to imply that EPA must continue treating the VHS model as a binding rule. EPA may choose to treat the model in the future as a non-binding policy. If it does so, however, it must truly exercise discretion in individual delisting cases, remaining open to all challenges to the use of the VHS model as well as its application in each individual delisting petition. *See Community Nutrition,* 818 F.2d at 949 (FDA could treat its rules as mere policy statements in the future, but "in order to do so, FDA must avoid giving action levels the kind of substantive significance that it now so plainly attaches to them"); *see also Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir. 1974) (if the pronouncement is a statement of policy rather than a rule, "[w]hen the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued"); *Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.,* 822 F.2d 1105, 1110–11 (D.C.Cir.1987) (agency's allowing substantive attacks on agency statement at each application supports characterization of the statement as policy rather than rule).

The availability of this curative option is supported by § 553's provision for actual notice as an alternative to notice in the Federal Register, as well as cases upholding rules on the basis of the challengers' actual notice. *See Conservation Law Found. v. Clark,* 590 F.Supp. 1467, 1475–76 (D.Mass.1984); *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1078 (Tempt. Ct.Ap.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Owensboro On The Air, Inc. v. United States,* 262 F.2d 702,

---

5. In reaching this broad holding, the Fifth Circuit cited *Braniff Airways v. CAB,* 379 F.2d 453, 466 (D.C.Cir.1967), for the proposition that the doctrine of harmless error is to be used only "'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached."

595 F.2d at 215. The cited portion of *Braniff* seems to us to deal only with the judicial discretion to remand under *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), and in any event seems not to adopt as strong a position as *United States Steel.*

707–08 (D.C.Cir.1958), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959). Further, allowing EPA this approach does not conflict with the rule that adequate notice and opportunity to comment must be provided *before* promulgation of a rule, not later. *See Mobil Oil v. Dept. of Energy,* 610 F.2d 796, 804 (Temp.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *National Tour Brokers Ass'n v. United States,* 591 F.2d 896 (D.C.Cir.1978). As the latter decision observed, § 553's requirement of a chance to comment serves two purposes: "(1) to allow the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule, and (2) to see to it that the agency maintains a flexible and open-minded attitude towards its own rules." *Id.* at 902. So long as EPA actually treats the VHS model as a policy open to attack in each case, the propriety of the rule's promulgation would not be in issue and the purposes of notice will be served.

While an agency's open-mindedness in individual proceedings can substitute for a general rulemaking, the record as a whole here convinces us that in ruling on McLouth's delisting petition the EPA lacked that state of mind with respect to the issues covered by the VHS model. Consequently, if EPA decides to detour around promulgation of a rule in strict accordance with § 553, it must reconsider McLouth's delisting petition with full recognition that those issues are open.